ALEX. McDOW ET AL. v. J. W. RABB.

(Case No. 768.)

1. FACT CASE — PRESUMPTION.— See statement of case and opinion for facts from which a conveyance of land may be presumed, consisting in acts and declarations of him who invokes the presumption, coupled with the conduct of him in whom the apparent title vested, though not of a character nor continued for a period that would confer title under the ten years' statute of limitations.

2. DECLARATIONS.— The declarations of a deceased party exercising acts of ownership of land, concerning his title, when made in connection with such acts, to the effect that he had purchased the land, cannot be admitted in evidence to sustain the title of one claiming under him.

3. ESTOPPEL.— An estoppel to be available as a defense need not be specially pleaded, but no verbal declarations can operate as an estoppel which did not influence the action of another.

APPEAL from Fayette. Tried below before the Hon. L. W. Moore.

Suit in trespass to try title by J. W. Rabb against Alex. McDow and E. L. Alford. The land in controversy was part of a survey of three leagues originally granted to William Rabb, the grandfather of plaintiff. This survey was in 1848 partitioned among the heirs of William Rabb. The land in controversy, about fifty acres, was a part of lot No. 42, and lies on the east side of Rabb's creek. John Rabb, a son of William and father of plaintiff, inherited a large part of this survey, including the land in controversy. John Rabb died in 1861, and plaintiff claimed partly by inheritance from him, and partly by purchase from his heirs, the brothers and sisters of plaintiff.

The deeds by which this purchase is evidenced were made in 1874; and the makers "release, relinquish, quit-claim and convey to J. W. Rabb all the right, title, claim and interest which they or either of them have or may have acquired by purchase, gift, devise or descent, in and to all those certain tracts or leagues of land situated in Fayette county known as the Wm. Rabb three-league tract."

It was admitted that the title was perfect in John Rabb. The defendants (Alford being merely a tenant of McDow) relied upon circumstantial evidence showing a conveyance from John Rabb to A. R. Gates, and a purchase by McDow at a sale of the land as the property of Gates' estate; upon the statute of limitations; and they further insisted that plaintiff was estopped by certain declarations of his father, John Rabb, made to McDow about the title to this land in 1858, by which declarations McDow was induced to believe that the title was in Gates, and so bought it when it was sold as the property of Gates' estate.

In 1852 Gates owned a large prairie plantation of six or seven hundred acres adjoining the land in dispute. Gates and John Rabb were near neighbors and friends, living

within half a mile of each other and of this land, which was a piece of timbered bottom subject for the most part to overflow. The record shows that in 1852 Gates entered upon the land now in dispute and publicly and openly cut and appropriated a large quantity of the timber; that he used this timber for making and repairing the fences on his prairie land, erecting a gin-house and cotton-press, building houses for his negroes, corn-cribs, cotton-pens, etc., and that from that time on he regularly resorted to this land for such wood and timber as he needed about his plantation; that this appropriation was open, visible, notorious and habitual, and accompanied by a public claim of title; that it was kept up through a series of years, until about the year 1860, when, the timber being well nigh exhausted, he inclosed the land or a larger part of it, put it in cultivation, and cultivated it until his death in 1863. After his death defendant McDow, as his executor, inventoried this land as a part of his estate, and continued to cultivate it until the flood of 1869 swept away the fence around this and other parts of the Gates plantation. After this, the executor being unable to re-fence the entire estate, contracted the inclosure so as to include only about two hundred acres, and this land was left uncultivated and uninclosed until 1874. In that year it was sold under a judgment against the estate of Gates, and bought by defendant McDow. It was admitted that these proceeding were valid. McDow rented it the same year to defendant Alford, who inclosed it and has cultivated it ever since. It was further shown that from the time when Gates entered upon this land in 1852, until his death in 1863, he had it assessed as his own, and regularly paid the taxes due upon it; and that after his death his executor regularly paid the taxes until it was sold in 1874; that while these things were going on John Rabb was living in the county — for several years within half a mile of the land, and not more than six miles away, until

1859, when he moved to Travis county, where he died in 1861.

Defendants offered to prove by a number of witnesses who had been neighbors of Gates and Rabb, repeated declarations of Gates made in the year 1852 and afterwards while using the land as above described, that he had bought the land from Rabb. Plaintiff objected to the testimony, which was excluded, and defendants excepted. Defendant McDow being introduced as a witness, stated that the land in dispute was a part of lot 42 in the subdivision of the three-league survey of Wm. Rabb, and lies on the east side of Rabb's creek; that in 1858 he purchased from John Rabb, as he and Rabb both understood, all the land which Rabb then owned in the three-league survey; that the purchase included that part of lot 42 lying west of Rabb's creek; that Rabb, who seemed perfectly familiar with the locality, and had the plat before him, then told him that he could not sell him the portion of lot 42 lying east of the creek (the land in dispute), because he had already sold it to Gates, and it belonged to him, and that his reliance on this declaration of Rabb induced him to buy the land when it was afterwards sold by the sheriff.

In rebuttal, plaintiff, being introduced as a witness, stated that John Rabb was in delicate health for several years before his death and gave but little attention to his affairs; that witness attended to the business which required riding about; that he never heard of Gates' claim to the land in dispute, or of his cutting the timber on it, until 1865; that witness went into the army in the fall of 1861, and did not return until 1865, when he saw for the first time the fence on the land. His brothers were also in the army. That after the sale made by his father to McDow he had himself purchased from his father four hundred acres of the three-league survey, and his title was undisputed. The assignments of error relate to the charge

of the court, the refusal of charges asked and the rejection of testimony. Verdict and judgment for plaintiff.

*Timmons & Brown*, for appellants.

*H. Teichmueller*, for appellee.

Delany, J. Com. App.— In his charge the judge, after stating that the legal title was in the plaintiff, proceeds as follows: "Defendant shows no written muniment of title in A. R. Gates, but contends that such a deed should be presumed from long length of possession of the land, and the declarations of John Rabb. Possession, to justify such a presumption, must be actual and notorious for a period of more than ten years; the mere cutting of timber would not constitute such possession." This is assigned as error, and we think correctly. The charge is perhaps not objectionable as an abstract proposition, except that it rather vaguely uses the expression "more than ten years." But it is not applicable to the case made by the proof. There was certainly much more proved than the mere cutting of timber. There was an open, visible, habitual appropriation of the timber for a series of years — indeed as long as there was timber to appropriate. This was done under an avowed claim of title, accompanied by the assessment of the land as the property of Gates, and the payment of taxes upon it by him. When the timber was exhausted, he, in 1860, fenced the land, put it in cultivation, and continued to cultivate it until his death in 1863; and the cultivation was continued by his executor until the fences were swept away in 1869.

These things were done under the very eyes of John Rabb, who for several years was living within half a mile of the land, and at no time more than six miles away, until his removal from the county in 1869. Besides this positive proof, there is strong negative evidence which

can hardly be overlooked.   There is not a circumstance stated in the record from which we can infer that after the year 1852 John Rabb ever claimed the land, or exercised any act of ownership over it, or paid any taxes upon it.   These two neighbors appear to have been friends through life, and the character of Gates, as it is exhibited by one of the plaintiff's witnesses, renders it extremely improbable that he would have trespassed upon his neighbor's property.   This witness, upon his cross-examination, testified that he was Gates' overseer for a term of four years, commencing in 1854; that he, under Gates' orders, constantly used the timber for the plantation, sometimes having as many as ten hands on the land at a time making rails, and never suspecting that any one else than Gates had any claim to the land.   Considering all these circumstances, together with the declaration of John Rabb in 1858 that he had sold the land to Gates, and without noticing the character of the two deeds made to plaintiff in 1874, we think the court should have instructed the jury that they might presume a conveyance from Rabb to Gates.   Dailey v. Starr, 26 Tex., 462, is hardly a stronger case than this.   In that case the judge instructed the jury that "a power to sell would be presumed."   They so found, and the supreme court affirmed a judgment rendered upon that verdict.   We have had some difficulty in determining whether the court erred in excluding the declarations of Gates that he had bought the land from Rabb.   Ordinarily, whenever it becomes important to prove that a man did any act, whatever he may have said about the act while it was being done is admissible as part of the act.   1 Greenl., 108-9.   But this rule should not be unnecessarily extended, as it may enable a party to make evidence for himself in the absence of his adversary.   Without discussing the matter further, we conclude that the court did not err in excluding these declarations.

The charge of the court upon the statute of limitation is

.assigned as error. The judge, after quoting the statute (Pasch. Dig., art. 4624), says: "The possession here referred to is actual, open and notorious. The mere cutting of timber is not such possession." We have already said that the proof shows much more than the mere use of the timber. The charge asked by the defendants, and refused, is as follows: "To constitute such adverse possession, there need not be a fence, building or improvement made; but it is sufficient for the defendants to show that they, and those under whom they claim, have exercised visible and notorious acts of ownership over the premises in controversy for the time limited by the statute."

The language of the statute is "peaceable possession, and cultivation, use or enjoyment thereof." In the preceding section, which limits the time to five years, the statute, in addition to these requirements, demands a deed duly recorded and the payment of taxes. In the section next preceding the last, limiting the time to three years, the statute demands possession and, at the least, a consecutive chain of title from the government down to the occupant. Thus we see that as the time is extended the statute becomes less exacting; but possession is required in every instance, and our courts have held that this means an actual possession. But the difficulty still remains of determining what is the meaning of the words "actual possession." So far as I know, our supreme court has not determined what acts shall constitute this possession. In Whitehead v. Foley, 28 Tex., 285, Justice Wheeler says: "No general definition short of the assertion of a merely arbitrary rule can relieve the question of difficulty in its application to particular cases. 'Actual, visible and substantial inclosure is decisive proof of such disseizin and of the limits of it.' Angel on Lim., 395 and notes. But there are many cases which hold that an inclosure is not essential to constitute an actual possession"—citing a number of cases.

In Steagall *v.* Huff, 54 Tex., 197, Justice Bonner says: "Without deciding that a case might not arise in which there would be such adverse possession and enjoyment of the land by the use of the timber thereon as would support the statute of limitation, we are of opinion that the occasional use of the land for timber purposes, without actual residence upon or cultivation of any part of it, as shown by the testimony in this case, was not such open, notorious and visible occupation as would constitute that adverse possession, use or enjoyment by which the presumption of notice and acquiescence upon the part of the true owner would arise to bar his right."

This was said in reference to the statute of five years. Again, do the words "actual possession" have the same meaning when we apply them to the long as to the short terms of limitation? It is certain that other words similarly applied do not have the same meaning in the different cases. The phrase "color of title," when used with reference to the limitation of three years, means one thing, but when applied to that of ten years it means a very different thing. A void deed or will is worthless in the one case but available in the other. Charle *v.* Saffold, 13 Tex., 94; Wofford *v.* McKenna, 23 Tex., 36; Kilpatrick *v.* Sisneros, 23 Tex., 114.

A too strict construction might render it impossible to acquire some kinds of real estate by prescription. It might be very difficult, perhaps impossible, to build upon a sand bank, or to inclose a rock quarry, or to cultivate a forest. But when a man, under an open, avowed claim of title, enters regularly into the business of selling sand from the bank, or rock from the quarry, and this is continued for the length of time required by the statute, this has been thought sufficient.

In the case before us the possession of Gates from 1852 to 1869 might perhaps be thought sufficient to satisfy the demands of the statute. But the statute was suspended

from January, 1861, to March 30, 1870.  Wood *v.* Welder, 42 Tex., 396.

From 1869 to 1874 the grasp of defendants upon the property was much less firm than before, and the ten years cannot be made out unless we hold that the payment of taxes during this latter period, together with the open claim of title and the control of the property, would be sufficient.  This we are not prepared to do, though authorities are not wanting which would seem to justify it.

We think the court erred in holding that defendants could not avail themselves of the defense of estoppel without pleading it specially.  Mayer *v.* Ramsey, 46 Tex., 371; Wright *v.* Doherty, 50 Tex., 34.  The error, however, is immaterial, as we do not think plaintiff ought to be estopped by the remark made by his father, John Rabb, to McDow in 1858, that he had sold the land to Gates.  It was a mere casual remark, dropped in the course of a negotiation about other property.  It was not made to influence the action of McDow, and there could have been no reasonable expectation at the time that it would do so.  Williams *v.* Chandler, 25 Tex., 11.

We conclude that the judgment should be reversed and the cause remanded.

REVERSED AND REMANDED.