## T. W. PHILLIPS ET AL. v. JOHN COAST ET AL.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS OF BUTLER COUNTY.

Argued October 21, 1889—Decided January 6, 1890.
[To be reported.]

1. If a person, while in possession of oil land, believing he has a valid title thereto, in good faith drill an oil well thereon, he has the right, if the land be afterwards recovered from him in ejectment, to retain out of the proceeds of the oil produced during his occupancy a sum sufficient to reimburse him for the cost of drilling the well.
2. In such case, if, pending the action of ejectment brought, the court issue a writ of estrepement and appoint a receiver under the act of June 5, 1883, P. L. 79, the defendant is entitled to compensation for the cost of putting down the well, out of a fund in the receiver's hands arising from the sale of the oil therefrom produced.

Statement of Facts.

3. A general notice to an occupant under color of title that the land in his possession belongs to another, does not as matter of law render his subsequent possession mala fide, even though he fail to inquire of the claimant for the facts upon which his claim rests, if such inquiry would not disclose facts inconsistent with a reasonable belief in his own title.

Before STERRETT, GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Nos. 117, 118 October Term 1889, Sup. Ct.; court below, No. 1 March Term 1889, Feigned Issue D., and No. 25 September Term 1888, C. P.

On July 2, 1888, at No. 25 September Term 1888, in the court below, Thomas W. Phillips and David Osborne brought ejectment against John Coast and others, to recover possession of a certain tract of oil land. The plaintiffs claimed as assignees of an oil lease from Andrew Blakely dated February 6, 1884, and duly recorded, for about ten acres of the eastern end of his farm, the leased premises being therein described as bounded upon the west by Glade Run. The defendants were lessees of another portion of said farm, their lease being dated February 9, 1887, and calling for Glade Run as the eastern boundary. Issue.

At the time the action of ejectment was brought, the defendants had commenced the drilling of two wells upon the disputed territory, known as No. 6 and No. 7 respectively. Oil having been obtained in these wells, the plaintiffs, on July 19, 1888, filed a bond with approved sureties and obtained a writ of estrepement to restrain the defendants from further producing oil upon the land embraced in the action; and on July 25, 1888, on application of the plaintiffs, the court appointed a receiver to take charge of said wells and the oil produced therefrom, keeping separate accounts respecting each well. The receiver then took charge of the wells, operated them, sold the oil in accordance with the orders of the court, and paid the expenses of operation out of the proceeds.

On the trial of the ejectment, November 17, 1888, the matter of dispute was as to the location of Glade Run at the date of the plaintiffs' lease. The plaintiffs claimed that the channel of the stream at that time was west of the sites of both No. 6 and No. 7 wells, and that all the land in dispute lay on the

east side of it and was embraced in their lease. The defendants claimed that the main channel was east of the sites of both wells and that the land in controversy was not a part of the plaintiffs' leasehold, but was covered by the lease of the defendants. The jury rendered a verdict fixing the location of Glade Run, on February 6, 1884, upon a line running between the two wells, and found for the plaintiffs as to all the land east of said line, and for the defendants as to the land west thereof. The part of the disputed land thus recovered by the plaintiffs included well No. 7. Judgment was entered upon the verdict.

On December 4, 1888, the receiver settled his account of well No. 7, which the court approved, ordering him to pay to the plaintiffs the balance in his hands except $2,500, which sum he was directed to retain until further order. On December 13, 1888, the plaintiffs petitioned the court for an order requiring the receiver to pay to them the $2,500, retained in the receiver's hands. No answer to this petition was filed by the defendants, but, on the day of its presentation, the court, at the request of counsel, directed that an issue be made up to try whether the defendants were entitled, by reason of permanent improvements or betterments made by them on the land recovered from them by the plaintiffs, to receive all or any part of the $2,500 in the hands of the receiver, the jury to determine how much of said fund, if any, the plaintiffs were entitled to, and how much, if any, the defendants were entitled to receive. An issue was accordingly framed and entered to No. 1 March Term 1889, feigned issue docket. The plaintiffs thereupon filed a declaration as in trespass for mesne profits, and the defendants pleaded specially, claiming that they were entitled to the cost of drilling well No. 7, and expenses incident to producing the oil therefrom, amounting to $2,263.60.

At the trial of the issue, on January 15, 1889, the defendants assumed the burden of proof and presented evidence tending to show that they had expended the sum of $2,263.60 for the rig, machinery and fixtures connected with well No. 7, and the cost of drilling the same ; that this expenditure was made in good faith, and in the belief that the well was on land to which the defendants were entitled under their lease ; that the appearances upon the ground were, at the time, such as to in-

dicate that Glade Run was to the east of the well, and that W. F. Coast, who on behalf of himself and the other defendants negotiated the lease under which the defendants had claimed, was informed by Blakely, the lessor, that the plaintiffs' lease extended only to the eastern channel. The plaintiffs adduced testimony tending to show that the appearances upon the ground in June, 1888, indicated that Glade Run was in the west channel; that before the defendants had done any work on the ground in preparation for drilling well No. 7, R. J. Phipps, an agent of the plaintiffs, notified W. F. Coast that the land upon which he was about to operate was part of the plaintiffs' lease, and warned him that if he operated on it he would do so at his peril, this notice applying to well No. 6 as well as to No. 7. W. F. Coast testified in rebuttal, on the part of the defendants, that the notice he received from Phipps was not given until after both rigs were completed, and that the rig at No. 7 cost $380; that after receiving the notice the witness did not inquire of Phillips respecting the grounds upon which his claim was based, but inquired of Blakely whether he understood the boundaries of the Coast lease to be the same as they were understood to be by the witness.

At the conclusion of the testimony the court, McMICHAEL, J., charged the jury in part as follows:

The presumption is, gentlemen, that this money belongs to Phillips and Osborne, the landholders. That has been settled. They had a right and have a right to the proceeds of that land, unless there be some reason shown by the defendants here, why they, the defendants, should receive a part of it. That throws the burden of proof upon the defendants to make out their case, and it is really treated here and has been tried, as though they were in point of fact, the plaintiffs.

Where an individual goes upon the land of another and makes improvements—even valuable ones, or whether they be valuable or not valuable—he has no right to receive any compensation for the improvements he makes, unless he makes them under an honest belief that he is the owner, or unless he makes them with the consent of the owner. There is no pretence of consent here. There is no dispute but that well No. 7 was put down by the defendants, Coast Brothers, and there is no dispute here but that it was a valuable improvement.

If the defendants are entitled to receive any of the money that is now in court for that improvement, then they are entitled to receive so much of it as they expended, if it was worth that much. If the property was increased in value to that amount—and about that there is really no dispute that it was, —that is, that it produced a considerable amount of oil here and really was valuable and is valuable to the property; so that that, gentlemen, eliminates out of this case every inquiry that you have to make except one, and that is, the good faith—if you please to call it that now—of these defendants in putting down that well.

Unless the jury are convinced from the evidence that the defendants had an honest conviction that this property was theirs and had good reason to believe it, then they would not be entitled to anything in this case. Then you come right to the question to be determined.

When you come to that, there are two features of it, as it is presented, at which you have to look. One is, as to the facts as they appeared upon the ground at the time when the defendants went into possession of this property to put this well down, and to that particular subject the larger part of the evidence that has been introduced was directed. The defendants undertake to prove too by witnesses, that from what was seen there upon the ground in June, 1888, when this well was commenced, Glade Run seemed to be to the east of that well, and that therefore the property belonged to the Coasts under their lease from Blakely. The plaintiffs have introduced several witnesses whose testimony is as to the same state of facts, tending as they claim to show that at that time Glade Run appeared to be west of that point, and therefore that place was upon the land of Phillips and Osborne. Now, how was that in fact? If it be true that an individual going upon that property at that time with the information that Coasts had up to that time, and looking at it, seeing it just as it was, would determine that Glade Run was west of that Run and not east of it, then there would be no good reason why the defendants should assume that they owned that property; no good reason why they should undertake to put that well down. And if you find the facts to be, then, that from the appearances on the ground as they then appeared, a man reasonably ought not to

conclude that Glade Run was east of it, and east of it at the time the Phillips lease was taken in 1884, then you may come to the conclusion at once that the defendants are not entitled to anything here; that it was a mere wanton trespass, without any reasonable grounds to suppose they had a right upon it, and you may find the verdict for the plaintiffs for the entire sum.

If you conclude, gentlemen, from the facts as they seemed upon the ground and from the evidence, so far as Mr. Coast was concerned, and what Mr. Blakely had shown him, whatever that may have been, that reasonably a man might conclude that Glade Run was east of the place where that well was put down, and that therefore it was on his lease, then you have another inquiry.

The plaintiffs here gave the defendant notice, there is no dispute about that, not to enter upon the property and not to put that well down,—that same notice including No. 6, about which there is no controversy now. But if, in point of fact, it did appear and a man could reasonably conclude from the ground that Glade Run was east of this well No. 7, then when the defendants received that notice that put them upon inquiry. Then it became their duty not only to look at the ground, but it became their duty to inquire of these plaintiffs what the facts were upon which they claimed to own that property.

Now, some of the witnesses in this case have fixed dates which would put this notice before anything was done upon the ground there, and some of them have fixed dates or stated times which would put it after part of the work was done upon the ground there. It will be for you to determine, if you reach this question at all, which of these states of fact is correct. If it be true that that notice was given before any work was done, then the defendants were put upon their full inquiry, no matter what they saw upon the ground, as to the place where Glade Run was in 1884. But if the jury conclude that that notice was given after this improvement was commenced, but before it was finished, and further conclude as I have already stated, that the defendants could reasonably consider that Glade Run was east of that point, then you may find for the defendants so much as they had expended up to the time that that notice was actually given to them, and may find that they are not entitled to any more. If you come to the conclu-

sion that that notice, if followed up with proper inquiry, would have informed them where Glade Run was in 1884, on November 6th, when they received that notice, then it was incumbent on them not merely to go to Mr. Blakely and inquire of him where he had leased to them—that, if you believe Mr. Coast, he knew already—but it was incumbent on them to inquire of the plaintiffs what the facts were upon which they based their claim, and that would be more emphatically true after the suit was brought. This action in ejectment was commenced on July 2, 1888. Some of these improvements, the engine, tanks and some other matters, as Mr. Coast testified, were put up after that suit was commenced, after the 2d day of July—indeed after the 6th.

Now on receiving that notice, then, if they had inquired, what would they have learned, had they gone to the plaintiffs, Mr. Phillips and Osborne, or either of them, or both of them? Would they have learned any state of facts which would have informed them where Glade Run in fact was in 1884, that is, to the west of this well? . . . .

The Coasts having received the notice that this property was the property of the plaintiffs, that they claimed it, then it was their duty to inquire; and they must now in the trial of this case be considered in precisely the same position they would have been in if they had learned all the facts which that inquiry would have revealed to them. If the jury come to the conclusion that a proper inquiry would not have revealed such a state of facts as would have convinced a reasonable man that this was the property of Phillips and Osborne, then his good faith would seem to be made out. Of course I am assuming now that you have passed the first question as to what appeared upon the ground, in favor of the defendants. But if the inquiry would have revealed such a state of facts to the defendants as would have convinced them reasonably, or convinced reasonable men, that Glade Run on November 6, 1884, was not east of that point, then they must be held from the time they got that notice to have had all that information, and if, with that information they would not have been, in good faith, claimants of that ground, then they would not be entitled to receive anything for the improvements they have made as they claim them in this case.

This, gentlemen, I think, gives you substantially the merits of the case, these two inquiries :

1. What did the ground show as to where Glade Run was in 1884 ? 2. What could they have learned by inquiry after they got the notice, as to where Glade Run was at that time ?

And if you conclude from all the evidence in this case, that having seen these facts and made the inquiry, and got the information which they could have got by inquiring, that they were in good faith still claiming and believing, and with all these facts had a right to believe that they owned that property, then they may be said to have gone on in good faith and put down their well. But if you find to the contrary, that they could not reasonably believe, with the knowledge of these facts that they were the owners of the property and had a right to it, then they would not be entitled to recover anything in this case, unless you come to the conclusion that the notice was not given until after they had expended some money on these improvements, and that these first improvements were made in good faith and the latter were·not made in good faith ; and if you come to this conclusion then give them so much as the improvement they had expended in good faith was at the time worth. . . . .

The plaintiffs request the court to charge you :

1. If the jury find that the defendants stated to the plaintiffs' agent that they would not enter on the premises out of which the mesne profits arose until they had seen plaintiffs, or T. W. Phillips, or one of them, about making some satisfactory arrangement ; and, that taking advantage of the plaintiffs being thus thrown off their guard, the defendants engaged an unusual force of laborers and entered upon the premises, and began the making of the improvements, the value of which they seek in this action to offset against plaintiffs' claim for mesne profits, and, anticipating an attempt of plaintiffs to forcibly eject them, and being prepared to maintain their possession so gained with force, the defendants are not entitled to the protection of the equitable rule allowing a bona fide possessor or tenant under color of title to offset the value of his improvements against the plaintiffs' claim for mesne profits ; and the verdict of the jury should be for the plaintiffs for the whole amount of the mesne profits, without any deduction for im-

provements or money expended on the premises by the defendants.[1]

2. If the jury find that the defendants entered upon plaintiffs' land after notice of plaintiffs' claim to the same, and made the improvements thereon, the value of which they are now seeking to offset against plaintiffs, the defendants are not entitled to such offset and the verdict of the jury should be for the amount of the mesne profits.[2]

3. If the jury find that prior to the entry of defendants on plaintiffs' land they knew from any source that there was a dispute, or a question about their right to the premises entered upon, and yet entered and made the improvements, the value of which they now seek to offset in this action, the defendants are not entitled to offset the value of the improvements made.[3]

4. If the jury find that prior to the entry of defendants upon plaintiffs' land they had a special notice of plaintiffs' claim to the same, by plaintiffs' agent or agents, and yet entered upon the same and made the improvements, the value of which they now seek to offset in this action, such entry was at the risk and peril of defendants, and they do not come within the rule allowing bona fide, innocent holders or tenants, to offset the value of their improvements; and this is the law although the jury may be satisfied that at the time of such entry the defendants believed they were the owners of the land so entered; and the verdict of the jury should be for the plaintiffs without any deduction for such improvements or money expended on said land by defendants.[4]

5. Withdrawn.

6. If the jury find that any part of the improvements now sought to be offset were made after the plaintiffs brought their action of ejectment for the land, and service was either made or accepted for defendants, for such improvements so made after the ejectment and service the defendants are not entitled to offset.[6]

Answer: Each of these points submitted by plaintiffs' counsel substantially asks the court to instruct you that if you find the facts to be as stated in the several points, then the defendants are not entitled to anything for the value of the improvements which they made on the property. I cannot so instruct you. The question of the good faith on the defendants' part

is a question for the jury under the facts in this case. All the
facts are submitted for your determination. You will find
what the facts were, and apply them to the question whether
the defendants are entitled to anything, and if anything, then
how much, under the instructions already given you.

The jury rendered a verdict for the plaintiffs for $236.40,
and for the defendants for $2,263.60.

On April 13, 1889, the court entered upon the record at No.
25 September Term 1888, a decree reciting the feigned issue
and the verdict rendered thereon, and, stating further that the
court saw no sufficient reason why it should disregard said ver-
dict, ordered that the receiver pay out of the fund in his hands
the sum of $236.40 to the plaintiffs, and the sum of $2,263.60
to the defendants. Thereupon the plaintiffs took these ap-
peals.

In the appeal at No. 117, the plaintiffs assigned for error:

1–6. The answers to plaintiffs' points upon the trial of the
issue.[1 to 6]

In the appeal at No. 118, the plaintiffs specified that the
court erred:

1. In decreeing that the sum of $2,263.60 be paid to the
defendants.

2. In not decreeing that the whole fund in the receiver's
hands be paid to the plaintiffs.

*Mr. D. B. Kurtz, Mr. S. W. Dana* and *Mr. Clarence Walker*
(with them *Mr. L. T. Kurtz* and *Mr. S. D. Long*), for the ap-
pellants.

1. All that a defendant in ejectment can claim, in the way of
compensation for improvements made during his occupancy
of land recovered from him, is to mitigate the damages by off-
setting the value of the improvements made in good faith, to
the extent of the rents and profits claimed by the rightful
owner: Sedgwick on Dam., 5th ed., 131–136; Green v. Bid-
dle, 8 Wheat. 1. If he has received no rents and profits, and
no claim for damages is made by the rightful owner, there can
be no recoupment. In the present case, there is no recoup-
ment nor anything analogous thereto. The defendants are
attempting to actively maintain and establish a claim to a fund

in court, which is the product of oil taken out of the land after the issue of a writ of estrepement against them. This oil is not rents or profits; it is a part of the land itself, and for the purposes of the present case is the whole of it, as neither party claimed anything but the oil. The taking of this oil from the land is waste: Dunlap v. Riddell, 7 W. N. 466. It is the same oil the defendants were restrained and prevented from getting, and the same the ejectment was brought for. The writ of habere facias would have delivered it to the plaintiffs, if no receiver had been appointed, and it must go to them with the rest of the land.

2. Even if the oil can be regarded as profits, the defendants are not entitled to be compensated out of it for their improvements, they having entered and made the improvements after actual and express notice from the plaintiffs of their title. It is the recognized doctrine of all the cases that none but a bona fide possessor can recoup for improvements. This relief is extended to him not of right, but of grace, and only on terms of submission to the dictates of justice: Ewalt v. Gray, 6 W. 427; 2 Story's Eq. J., § 799. He should show that after diligent and faithful inquiry his claim appeared to him free from suspicion: 2 Kent's Com., *334, *338; Green v. Biddle, 8 Wheat. 1. By the answers to our points, the court practically nullified the effect of the plaintiffs' notice. The submission of the question of good faith notwithstanding the notice, tended to divert the jury from the proper point of inquiry: Schwenk v. Kehler, 122 Pa. 67; Harrisburg Bank v. Forster, 8. W. 304. The very fact of notice of an adverse claim or right destroyed the bona fides of the defendants' possession: 2 Pomeroy's Eq. Jur., §§ 592, 745, 753–762; Le Neve v. Le Neve, 2 L. C. in Eq. 23; Green v. Biddle, 8 Wheat. 1; Morrison v. Robinson, 31 Pa. 456. The decree of the court should have been in favor of the plaintiffs, notwithstanding the verdict; it was merely advisory: Basey v. Gallagher, 20 Wall. 670.

*Mr. John M. Thompson* and *Mr. Charles McCandless* (with them *Mr. Wm. Thompson*), for the appellees:

1. Whether oil produced on a leasehold is profits or rents, or is part of the leasehold itself, is a question not raised on the trial and not for argument here. The plaintiffs' points raise

substantially but one question, viz., whether the notice by Phipps that Phillips had a claim to the land, rendered all the acts of the defendants mala fide. We may remark, however, in connection with this new position, that the word, profits, seems to cover a pretty wide field; that the Common Pleas case of Dunlap v. Riddell, 7 W. N. 466, is not fully in harmony, either in letter or in spirit, with Emerson's App., 95 Pa. 258, and, as it was decided prior to the act of June 5, 1883, P. L. 79, it has no relevancy in the present case. Under the act cited equity has jurisdiction for all purposes, including the equitable distribution of the fund in court, which was placed there for the very purpose that equity might be meted out to all parties.

2. The notice from Phipps was vague, and indicated nothing beyond the fact of claim. Good faith and fair dealing should not be peculiar to one side. They required a statement of what title Phipps represented, or enough to put the defendants on inquiry. Such notices from parties without a shadow of title are not infrequent as a mode of levying black-mail. The evidence of the defendants' good faith is found in their expenditure of some $2,500 on property pointed out by their lessor as within their lease. That they believed it to be so is not strange, in view of the fact that the east channel, pointed out by Blakely as the boundary, was full of water and had every appearance of the true channel. Besides, the ejectment extended to land clear west of both channels. The plaintiffs claimed both No. 6 and No. 7 wells, and to the defendants the claim for the one appeared as unfounded as that for the other.

3. If the radical doctrine contended for, that for improvements made after notice no recovery can be had, be conceded, it will not avail the plaintiffs; for, in view of the instructions of the court, the jury must be regarded as having found that the notice was not given until after the entry of defendants and the making of improvements worth $2,263.60. The instructions to the jury were clear, and as favorable to the plaintiffs as they could expect, unless actual and express notice had been given before the entry of defendants, which is unwarranted by any testimony or inference in the case. Morrison v. Robinson, 31 Pa. 456, cited by the plaintiffs, is authority for the instructions given, and they are fully sustained by Kille v.

Ege, 82 Pa. 102, and Ege v. Kille, 84 Pa. 333. The decree does substantial justice to both parties, and is what is demanded by equity and fair play.

OPINION, MR. JUSTICE GREEN:

The question of the good faith of the defendants in putting down the well No. 7 was submitted by the learned court below to the jury with so much care, with so many cautions, with so much exactness, and with such perfect legal accuracy, that we must assume it to have been found absolutely, and in accordance with the precise limitations fixed by the court; that is, we must assume that, from the appearances on the ground as they were in 1884, a reasonable man would conclude that Glade run was then east of the well; and, in addition to that,—for so the court left it to the jury,—that after the notice of the plaintiffs, if the defendants had made inquiry from them for the facts upon which they founded their claim of title, they would not have learned that Glade run was west of the well in 1884. This being so, there can be no question of the good faith of the defendants to be now considered by us. It was a question of fact, to be decided by the jury alone, and they have found it in favor of the defendants. There was ample testimony to justify the finding. The channel of Glade run was not definitely fixed, for the water of the stream ran in two courses, and which was the real channel in 1884 was fairly open to question. The notice of the plaintiffs fixed no boundaries, described no line, pointed out no marks. It was merely a general notice that the well was on their property. The same notice also included well No. 6, but that well has been found *not* to be on plaintiffs' land. We are bound, therefore, to conclude that the acts of the defendants in putting down well No. 7 were done in the honest belief that it was upon their own land, and, that if they had made inquiry of the plaintiffs for the facts upon which they claimed title, such inquiry would not have revealed to them that the well was on the plaintiffs' land.

Having, then, put down the well in the utmost good faith, why should they not be compensated for the cost of the well, which the plaintiffs have recovered and now hold, and by the use of which all the oil that the well yielded was obtained?

This is a kind of improvement of an unusual character, and one which particularly commends itself to the favorable consideration of the courts. It was an oil well, with all the machinery and appliances necessary to its operation. Now, without this well and machinery, the oil could not possibly be obtained. After it was completed, its operations were all for the benefit of the plaintiffs. They have actually received the entire advantage of its structure and maintenance, without a penny of cost to themselves, and without any risk. All the cost and all the risk were borne by the defendants. If the defendants had not put down the well, the plaintiffs would never have obtained the oil without themselves sinking the well at their own cost and their own risk. Obtaining oil from the bowels of the earth is a very different thing from obtaining crops from the surface of the ground. The oil exists only at a distance of hundreds of feet below the surface. If it is not developed by means of wells, it is the same as if it had no existence at all. It is, in a state of nature, of no use or value whatever to the owner of the land. In order to obtain it, he must, by absolute necessity, incur the expense and the risk involved in putting down wells to reach it, and draw it from the deep recesses of the earth. The defendants, in the most perfect good faith, expended their money in sinking this well, as the jury has found; but they have reaped none of the benefits. All of these have gone to the plaintiffs. They could not possibly have enjoyed those benefits, if they had been in the possession of the land, without incurring this very same cost. Therefore it is no hardship whatever to them to repay to the defendants the bare cost of the well and appliances, which belong to the plaintiffs now, and the whole benefits of which accrue to them alone.

The fund, out of which this repayment is asked by the defendants, is a part of the proceeds of the very oil which was produced by their own good-faith expenditure in sinking the well. It has cost the plaintiffs nothing, and we know of no good reason, in law or morals, why the reasonable claim of the defendants should not be allowed. The proposition that oil is part of the land, and cannot be regarded as mesne profits, and hence the right to compensation for valuable improvements, has no application. The oil has been taken. It is not

a question of staying waste, but of allowance for the cost of valuable improvements, actually necessary, and made in good faith. For such improvements compensation is allowed, whether that which is taken be minerals, oil, or other substance of the land, or not. This was fully decided in Kille v. Ege, 82 Pa. 102, and Ege v. Kille, 84 Pa. 333. There, large quantities of iron ore were taken, and we held that the defendants were entitled to compensation for their permanent improvements, which gave increased value to the land. That such was the character of the improvements in the present case, was not and could not be questioned. We are of opinion that the plaintiffs' points were correctly answered, and that there was no error, either in the trial of the issue or in the final decree.

> Decree affirmed, and appeal dismissed, at the cost of the appellant.