Julia THORESON

v.

Grady FOX et al.

No. 7441.

Court of Civil Appeals of Texas.

Amarillo.

March 8, 1965.

Rehearing Denied April 12, 1965.

Lemon, Close & Atkinson, Perryton, for appellants.

Underwood, Wilson, Sutton, Heare & Berry, Amarillo, for appellee.

CHAPMAN, Justice.

This opinion is announced in lieu of our opinion of March 8, 1965, without change in results.

This is an appeal from a judgment based upon a jury verdict in a suit by Julia Thoreson against Grady L. Fox, Richome Oil & Gas Company, a partnership composed of J. B. Hermann and R. P. Hermann, and J. B. Hermann and R. P. Hermann individually, together with the Amarillo National Bank and C. P. Ware, Trustee, and Panhandle Eastern Pipeline Company. No judgment was entered against the bank, Mr. Ware, Trustee, nor the pipeline company, so only Grady L. Fox, the named oil and gas company, and the Hermanns in their various capacities stated are involved in the appeal as defendants. Julia Thoreson, plaintiff below, has appealed from that part of the judgment awarding defendants compensation for valuable improvements made in good faith represented by expenses attendant upon the drilling, and expenditures made in equipping the well for production and for placing it in the pipeline company's gas stream. Because all parties involved in the appeal are both appellants and appellees, we shall refer to them as in the court below.

The suit was filed by Julia Thoreson, the fee simple owner of the land immediately prior to December 13, 1958, the date upon which she executed an oil and gas lease to Grady L. Fox, and was instituted as an ac-

tion in trespass to try title to recover the 234.67 acres of land in question and to cancel the oil and gas lease and additional instruments constituting a cloud upon her title. The pleadings upon which she went to trial alleged four other counts after alleging the trespass to try title. In the fourth count she alleged in connection with the fixtures that she had no adequate remedy at law, thus invoking the court of equity for relief to prevent an offset recovery for good faith improvements claimed by defendants. Though the case was tried before a jury, the issues submitted have to do generally with defensive issues involving waiver, estoppel and ratification, and defendants' claim for alleged good faith improvements.

The trial court in the interpretation of the lease awarded cancellation thereof for failure to produce within the time provided, title and possession to plaintiff under her possibility of reverter, and awarded judgment for defendants for good faith improvements, the amount of which was stipulated.

The troublesome legal question to be resolved so far as the oil and gas lease is concerned is Paragraph 2 thereof now quoted verbatim:

"This lease is a commencement lease under which the lessee or his assigns are obligated to commence the drilling of a well on the leased premises within one hundred twenty (120) days from the date hereof, said well to be drilled to a depth sufficient to test the Hugoton Field or about 3,000 feet. Such well shall be completed within one hundred twenty (120) days after commencement thereof. If such well is not commenced and completed within such time, then this lease shall terminate as to both parties. If however, production is obtained, then this lease will remain in force for as long thereafter as oil, gas, casinghead gas, gasoline or any of them is produced."

Defendants' attack upon the trial court's interpretation of the quoted Paragraph 2 is that the lease in question is a "no-term" lease; that Paragraph 2 is only a drilling clause and the last sentence of Paragraph 2 "standing alone" does not constitute a special limitation or termination provision. Defendants also state in their brief:

"The assertion that the lease in question contained a primary term of 240 days, constituted the complete basis of plaintiff's claim that the lease had terminated."

However, we find in studying plaintiff's pleadings upon which she went to trial that she alleged the lease prescribes a primary term of 120 days from December 13, 1958, which would be to April 13, 1959, and an exploration and development term of 120 days from and after the commencement of the initial well which was commenced on March 10, 1959, and that the lease terminated under its own terms and provisions upon the expiration of the exploration and development term of 120 days after the commencement of actual drilling operations which would be July 9, 1959, and that in order to maintain said lease in full force and effect defendants must have commenced the production in paying quantities on or before 120 days from the commencement of actual drilling operations, which would have required production to begin by the end of the day on July 9, 1959. Production was not commenced until about September 3, 1960.

The well unquestionably was a good producer, it having produced and had sold from it to Panhandle Eastern Pipeline Company, and for irrigation fuel to plaintiff's nephew, more than $45,000 in gas from the date it was started on production to December 31, 1963, a period of three years, three months and twenty-eight days.

Neither from the cases cited nor from our research have we found any case involving the interpretation of an oil and gas lease with conditions such as those making up Paragraph 2 above quoted. Therefore,

we must rely upon well-recognized text writers and upon cases with analogous situations for our reasoning and conclusions.

Perhaps the most extensively quoted and favorably recognized text writing authority in Texas on property interests created by leases involving oil and gas is Honorable A. W. Walker, Jr., former professor in the University of Texas Law School in the field of oil and gas. After first discussing the exigencies of the times that gave birth to the "no-term" lease he then stated in describing it that:

> "The phraseology of the habendum took numerous forms but it was characteristic of all types that the lessee might keep the lease alive indefinitely, by the payment periodically of a delay rental, without the drilling of a well, * * * Texas Law Review, Vol. 7, p. 13."

Corroborative of the delay rental characteristic of the "no term" lease are the cases cited by defendants as examples: Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290; Texas Co. v. Davis, 113 Tex. 321, 254 S.W. 304; Rosson v. Bennett, Tex.Civ.App., 294 S.W. 660 (N.W.H.).

 A mere cursory glance at Paragraph 2 of the lease shows that it contains no shut-in royalty clause, no provision for the payment of delay rentals to defer the date of drilling, nor any other constructive production clause. Based on the described characteristics of "no-term" leases, it is therefore apparent that our lease is not a "no-term" lease. In any event, the courts have held in effect that the estate created by "no-term" leases are subject to termination by operation of special limitations. Stephens County v. Mid-Kansas Oil & Gas Co., supra; Texas Co. v. Davis, supra. "Actually, under the decisions, in this state, the so-called oil and gas 'lease' is a conveyance of the title to the minerals in place

subject to special limitations which render, what would otherwise have been an absolute fee simple, a determinable fee." Walker, 7 Texas Law Review, p. 554.

Since defendants by brief refer in their arguments to plaintiff's seeking a forfeiture against them, it may be well to consider whether we are dealing with a determinable fee subject to a special limitation, or a fee simple subject to a condition subsequent, a forfeiture provision.

 A condition subsequent, being a forfeiture provision, is looked upon with such disfavor by the courts it is generally held that substantial compliance with a condition subsequent is sufficient to prevent a forfeiture.[1] Walker, 8 Texas Law Review, p. 486; Tiffany on Real Property, 2 Ed. 1920, Sec. 82; 3 Thompson on Real Property (1924), Sec. 2033. "A special limitation, on the contrary, does not operate to cut short the estate but simply fixes one of the natural limits of the estate beyond which the estate cannot endure. * * * Moreover, it is self-operative. Hence, the ameliorating principles stated above as controlling the enforcement of conditions subsequent as forfeiture provisions are not applicable to clauses of special limitation." Walker, 8 Texas Law Review, p. 486. (Footnote ours.)

In discussing the lease in the Stephens County v. Mid-Kansas Oil & Gas Co., case, the Supreme Court said:

> "[I]t seems obvious * * * that the grants might endure forever, since the lands might never cease the profitable production of oil or gas; [the same is true in our case] and * * * it was intended by all parties that the land should be used for no other purpose than the specified mineral exploration and production, and that *the grants were to be enjoyed only while such use continued and were to immediately ter-*

---

1. This is not to imply that we consider defendants substantially complied with the conditions under which they were bound by the quoted paragraph. We believe the record shows without question they did not do so after discovery.

*minate on cessation of the use."* (Italics ours).

The same court amplified such position somewhat in W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, in the following language:

"Regardless of the lessee's intention, his estate [a determinable fee] terminates, under its limitation, when there is a complete cessation of actual use of the land for the purposes of the lease." (Parenthetical statements ours.)

Now to the application of these principles to the lease in question and the facts existing at the time it was executed. As suggested by plaintiff's Reply to Defendants' Motion for Rehearing [it] "was the private 'gas patch' of Phillips Petroleum Company," and the record shows when Phillips unsuccessfully sought to lease the 234.67 acres their landman told Miss Thoreson they would not need to lease anyhow because they would drain her lease with offsets. It is also in the record that several pipelines were located in that proven production area and it is without contradiction that time was of the essence.

She had always inquired when someone sought to lease her property in Texas if they had any connection with Phillips Petroleum Company and the jury found she represented to Mr. Fox that she did not want any of the gas from her property to be sold to Phillips. She denied this but her testimony does show she did not care for Phillips Petroleum Company because they would not sell gas to the farmers for irrigation. Testimony is without contradiction that she was positively conscious of the acute drainage problem at the time, and the first lease she tendered Mr. Fox provided for 90-day periods where the present Paragraph 2 contains 120-day periods. She yielded to his request to that extent only.

We attach no significance to the statement in the first few words of Paragraph 2 in which the lease is referred to as "a commencement lease." It shows to have been prepared by a Minnesota or North Dakota lawyer and the clause may or may not have some significance in those states. However, that first sentence required lessee or his assigns to commence the drilling of a well on the premises within 120 days from the date of the lease on December 13, 1958, and to be drilled to a depth to test the Hugoton Field or about 3,000 feet. As shown by the quoted paragraph, the lease then provides: "If such well is not commenced and completed *within such time* (referring to the second 120-day period), then this lease shall terminate as to both parties.[2] If however, production is obtained, then this lease will remain in force for so long thereafter as oil, gas, casinghead gas, gasoline or any of them is produced." (Italics and parenthetical statements ours).

Thus, the last sentence, beginning, "If however," is alternative to the preceding sentence expressly providing for termination upon the expiration of the second 120-day period if lessee failed to commence and complete the well. This being true, it necessarily refers to and requires production on or before the expiration of the second 120-day period. Since the last sentence refers to the expiration of such second 120-day term, it being an alternative provision, the "as long thereafter," as oil, gas, etc., is produced, language marks the duration of the estate granted and shows by its own terms the intention of the parties that lessee's estate was to terminate automatically under those express terms and provisions at the time this stipulated situation does not exist; i. e., production of oil or gas in the legal meaning of the term "production." Therefore, we believe the "as long thereafter" language granted a determinable fee subject to a special limitation, which was production at the end of the second 120-day period or the determinable fee would revert ipso facto. The record shows defend-

---

2. The fact that the well was completed within approximately 30 days from commencement indicates such requirement was not an unreasonable one.

ants had approximately 90 days to put the well on production after discovery.

The well having been commenced on March 10, 1959, the second 120-day period started to run. That period then expired on July 9, 1959. Acutal production was not commenced until September 3, 1960, almost fourteen months after the end of the 120-day period from the time it was commenced and approximately seventeen months from the day it was completed, capped and shut in.

Lease provisions containing special limitations measured by "so long as", "until or during", and similar language have been strictly and literally construed by the courts and time has been held to be of the essence. For example: Where the lessee did not commence actual drilling or reworking operations within the time provided in the lease, it automatically expired and the interest of the lessee reverted to the previous fee mineral owner.[3] When the lessee did not tender the shut-in gas royalty payment within the period stipulated by the lease it automatically terminated under its own provisions.[4] The act or operation relied upon by the lessee must conform to the provisions of the lease, so the cessation of production clause could not be employed to extend the term of the grant, in the absence of actual production.[5]

A case that appears to us to be as analogous as any we have found to our own is Clark v. Holchak, 152 Tex. 26, 254 S.W.2d 101, containing the following paragraph of limitation or condition of defeasance:

" 'It is further agreed and herein stipulated that in case there is no paying production on said land on December 10, 1945, and for six months thereafter, that this grant shall become null and void, and the minerals hereby conveyed shall revert to the Grantor, their heirs and assigns, but should there be such production, then and in that event, this grant shall remain in full force and effect until such production ceases, after which this instrument shall become null and void."

The first quoted clause in the Clark-Holchak case is similar to our own sentence three providing the lease shall terminate if the well is not commenced and completed within the second 120-day period since the well was actually drilled and completed during the stipulated time. The Supreme Court did not consider the second clause in the Clark-Holchak case beginning with "but should there be such production" as presenting any problem, stating:

"That is clearly the statement of an additional limitation on the grant and does not render uncertain the meaning of the first clause. The deed was dated December 10, 1930. The only provision in the deed expressly placing any limitation on the grant is to be found in the sentence under review. That sentence, as above stated, provides for a reverter if there should be an absence of paying production during a stated six months' period. The subsequent provision defines the term of the grant should there be paying production during the six months' period. It provides that the duration of the grant will be extended beyond the six months' period only so long as paying production continues, and negatives the conclusion that the mere existence of paying production during that period will render the grant perpetual without regard to the uninterrupted continuation of that production."

We believe Clark-Holchak refutes defendants' contention to the effect that the last sentence of Paragraph 2 does not express an event, which would in itself bring

---

3. Woodson Oil Company v. Pruett, Tex. Civ.App., 281 S.W.2d 159 (N.R.E.).

4. Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339; Steeple Oil & Gas Corp. v. Amend, Tex.Civ.App., 337 S.W.2d 809 (N.R.E.).

5. Gulf Oil Corp. v. Reid, 161 Tex. 51, 337 S.W.2d 267.

about a termination, the court holding "until such production ceases" has the same meaning as "so long as paying production continues," thus recognizing "so long as and until" are words of limitation.

The Clark-Holchak case was reversed and the San Antonio Court of Civil Appeals in the next trial interpreted the paragraph under discussion in that case to mean that the discovery of oil was not sufficient to extend the grant but that actual production in paying quantities was required. Holchak v. Clark, Tex.Civ.App., 284 S.W.2d 399 (writ refused). This rule had been previously settled by our Supreme Court in Garcia v. King, 139 Tex. 578, 164 S.W.2d 509.

■ The clause interpreted in Clark Holchak and our clause are both expressed in the alternative and make the special limitation effective as of the date stipulated in the preceding clause.

For all the reasons stated and the cases cited defendants' first three points are overruled.

■ Defendants next assert error in the trial court's construction of the lease because the parties' practical construction of the lease, as indicated by their actions, in the absence of actual production in 240 days following the execution of the lease would not cause a termination. We believe the record shows to the direct contrary.

Plaintiff started making objections early in 1959 after she saw in the Spearman newspaper that Mr. Fox had made an assignment of an interest in the lease to Richome Oil & Gas Company without her consent, which she contended was a breach of their contract. Then in September of 1959 Mr. Fox personally took a proposed amendment to the lease to her home in North Dakota, which provided for a lease extension and shut-in gas royalty agreement, after the attorney of the Hermann family had heard a discussion at a landman's oil and gas institute of Gulf Oil Corp. v. Reid, supra, and became concerned about

their failure up to that time to produce the gas that had been discovered. She refused to sign it and threw the instrument back at him. Her farm employee testified that Mr. Fox in his presence stated the lease "had run out." She also refused to accept the $234.67 shut-in gas royalty payment covering the period from August 12, 1959, to August 12, 1960. She refused to accept all other offers of extension, refused to cash any checks sent her, refused to sign all division orders and wrote people in Texas from the Attorney General to the Sheriff of Hansford County seeking help to take care of her mineral interests, complaining to Panhandle Eastern Pipeline Company in December of 1959 that the lease to Mr. Fox had terminated. Her action clearly reflects her belief that the lease had expired and she was making every effort to do something about it. We believe this point must be held to be without merit. Southland Royalty Co. v. Pan American Petroleum Corp., Tex., 378 S.W.2d 50. In discussing the "Construction-By-The-Parties-Rule" the court in the case just cited said:

"[the] rule can not be predicated upon evidence that one of the parties by the exercise of diligence should have known that the other was construing a contract in a particular manner. Before that rule may be used to ascertain the intention of the parties, the evidence must show that the practical construction was 'deliberately given it by both parties.'"

■ Estoppel is also urged by defendants as a bar to the judgment rendered. The jury found Mr. Fox did not rely upon any representation she made of not selling to Phillips to delay the connection of the well to another and that her silence was not intended to induce him to make additional expenditures to connect with Panhandle-Eastern. He stated he would have connected to Phillips had he known his lease would terminate for failure of actual production and that he dealt with several pipeline companies in looking for a suitable market. Un-

der this record we believe the jury answers have sufficient support in the evidence.

We are urged in effect to reconvey the lease to defendants by estoppel although, if the trial court and our court are correct in our interpretation of Paragraph 2 of the lease, it had expired by its fixed terms months before. Under such circumstances the courts have refused to reconvey the lease by estoppel. Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 137 A.L.R. 1032; Gas Ridge v. Suburban Agricultural Properties, 150 F.2d 363 (Fifth Circuit); Haby v. Stanolind Oil and Gas Company, 228 F. 2d 298 (Fifth Circuit).

Defendants urge various other grounds of waiver and estoppel because of plaintiff's conduct in refusing to answer correspondence, to sign division orders, in permitting defendants to make further expenditures, etc. We have searched the record carefully and find no action or failure to act that could be interpreted as waiving any of her rights, and we find sufficient evidence to support the jury's answers to special issues 2c, 3a, and 6. Plaintiff was an elderly spinster almost 70 years of age dealing with Mr. Fox, a lawyer, and at least one other defendant lawyer. The record shows she was a "hard trader" and we believe the record could also be interpreted to say that she was quite suspicious of those with whom she had business dealings, including even her brother in Texas. Additionally, after she had signed the lease, when she was faced with the request by Mr. Fox personally, she refused to yield to any of his requests, however fair they may have been. She also refused to sign any instruments sent her by defendants or by the pipeline company in its effort to properly transact its business with her.

The court defined "waiver" as "an intentional relinquishment of a known right." If ever we studied a record that showed an absolute lack of any intention of a lady to waive any legal right in connection with her property, it is the conduct of plaintiff in this case. We do not believe the authorities cited by defendants in support of their contention for waiver and estoppel apply to the facts of the instant case.

This case being actually two law suits in one trial, with separate briefs for each, we must now consider the appeal of plaintiff, Julia Thoreson, from that part of the court's judgment which awarded to defendants the sum of $32,376.31, for valuable improvements made in good faith. She does not attack that part of the decision of the court awarding defendants the sum of $18,190.94, as expenses incurred subsequent to July 9, 1959, the date upon which she contends and we have found the lease terminated.

As heretofore stated, plaintiff alleged four other points after alleging her trespass to try title, in the fourth of which she invoked the court of equity by alleging she had no adequate remedy at law to prevent defendants from pulling and removing the casing and from destroying, damaging or injuring the well.

Paragraph 5 of the subject lease provides in part as follows:

"Lessee shall have the right at any time during the term of this lease and within six (6) months after expiration thereof, to remove all machinery, fixtures, houses, buildings and other structures placed on said premises by the lessee, including the right to draw and remove all casing."

The fixtures were not removed within that period and plaintiff is contending that because defendants' answer contained an offset for valuable improvements made while they had adverse possession under Article 7393, Vernon's Ann.Tex.Civ.St., they are entitled to only the amount expended within the six months after expiration of termination of the lease and that expended afterwards under their adverse claim. She is therefore seeking the powers of the court of equity but demanding that defendants be bound by the strict rules of law.

The Fort Worth intermediate appellate court in Jarrell v. Boedeker, Tex.Civ.App., 146 S.W.2d 293 (N.W.H.) has stated:

"And according to the following authorities, defendant's right to that equity could be awarded even under his plea of not guilty. Galveston, H. & S. A. Ry. Co. v. Blakeney, 73 Tex. 180, 11 S. W. 174; 1 Tex.Jur., para. 71, page 690; 17 Tex.Jur., para. 3, page 5, para. 36, pages 38–39; 41 Tex.Jur., para. 138, page 631; Wright v. Doherty, 50 Tex. 34; McDow v. Rabb, 56 Tex. 154; Mayer v. Ramsey, 46 Tex. 371."

See also Jenkins v. Pure Oil Co., Tex. Civ.App., 53 S.W.2d 497 (N.W.H.), where the question of insufficient pleadings was raised. There the court said:

"It is clear from the above allegations that appellee's petition was not only in trespass to try title, but, in addition, was an equitable proceeding for cancellation of appellants' lease, to remove cloud from title, and for temporary and perpetual injunction. Therefore appellants' right to recover on their claim of improvements in good faith does not rest upon, nor is confined to, the statutory requirements of articles 7393–7401, R.C.S. of 1925, providing for the recovery of the value of improvements made in good faith in an action of trespass to try title; this, because aside from said statute and in addition thereto, the case, as presented by the parties hereto, would authorize, under proof sustaining same, appellants to recover judgment against the appellee for improvements made in good faith, and enhancing the value of its mineral lease of the involved 66 acres of land on general equitably principles."

Also the Fort Worth Court of Civil Appeals in Corbett v. Allman, Tex.Civ.App., 189 S.W. 91, has held: "The right to recover for improvements in good faith, while established by statute, * * * is yet a right founded in equity, and in its enforcement equitable rules apply."

■ The question still remains as to whether through equity, lessees, who have drilled, discovered gas in paying quantities, and failed to produce within the period they mistakenly believed in good faith their lease was still in existence may recover for the cost of drilling and equipping a well as valuable improvements to the extent such improvements enhance the value of lessor's freehold estate and does not exceed necessary expenditures.

The jury found defendants did not believe the lease in question required actual production within 240 days, so they did not in good faith believe they would have to remove the fixtures and casing by January 9, 1960, to come within Paragraph 5 of the lease permitting such removal within six months. But this still leaves the question of whether the drilling expense could be recovered as valuable improvements in good faith as an offset under the equitable theory of unjust enrichment. We do not believe our Supreme Court has passed on the question under facts analogous to our own, but the Supreme Court of Pennsylvania in Phillips v. Coast, 130 Pa. 572, 18 A. 998, has written favorably for the producer in a similar situation.

There an oil well had been mistakenly drilled upon a wrong tract of land. Plaintiff filed suit for ejectment. The question arose as to whether defendants were entitled to be compensated out of the fund representing the proceeds from oil they had produced from the land to pay for drilling, equipping and operation of the well. The issue was resolved favorably to defendants, the court saying:

"This is a kind of improvement of an unusual character, and one which particularly commends itself to the favorable consideration of the courts. It was an oil-well, with all the machinery and appliances necessary to its operation. Now, without this well and machinery, the oil could not possibly be obtained. After it was completed, its operations

were all for the benefit of the plaintiffs. * * * The defendants, in the most perfect good faith, expended their money in sinking this well, as the jury has found; but they have reaped none of the benefits. All of these have gone to the plaintiffs. They could not possibly have enjoyed those benefits, if they had been in the possession of the land, without incurring this very same cost. Therefore it is no hardship whatever to repay to the defendants the bare cost of the well and appliances, which belong to the plaintiffs now, and the whole * * *. The fund out of which this repayment is asked by the defendants is a part of the proceeds of the very oil which was produced by their own good-faith expenditure in sinking the well. It has cost the plaintiffs nothing; and we know of no good reason, in law or morals, why the reasonable claim of the defendants should not be allowed. The proposition that oil is part of the land, and cannot be regarded as mesne profits, and hence the right to compensation for valuable improvements, has no application. The oil has been taken. It is not a question of staying waste, but of allowance for the cost of valuable improvements, actually necessary, and made in good faith."

Surely, if a trespasser, as in the Pennsylvania case just cited, is entitled to recover for the cost of drilling and for machinery and appliances incident to the operation of the well defendants here would be entitled to recover for the value of the improvements to the land itself, limited to the actual cost to the defendants. By stipulation it was agreed plaintiff's estate had been enhanced in value at least as much as the cost to defendants of the improvements made. The fact that defendants unsuccessfully sought a supplementary clause as a precaution against termination of the lease does not negative the jury finding that they did not believe the lease required actual produc-

tion within 240 days because there is probative evidence to support the finding.

Plaintiff not only recovered her title to the minerals in place, but 452 feet of 9⅝" surface casing, 2,909 feet of 5½" casing, a series of valves and connections known in the oil and gas fraternity as a "Christmas Tree" and other appurtenant well and wellhead equipment, but she also recovered a productive gas well in active operation in the gas stream of a profitable paying purchaser, all placed there by the efforts of and with the funds expended by defendants. Additionally, she had $11,733.33 bonus money for which, of course, no recovery was sought.

Though not involving an oil and gas question the San Antonio Court of Civil Appeals in the case of Mulholland v. Jolly, 17 S.W. 2d 1109, has written on the equitable maxim that: "He who seeks equity must do equity" in a case for recovery of valuable improvements placed on property innocently derived through a forged deed. That court speaking through Chief Justice Fly stated:

"* * * we think that the maxim that 'He who seeks equity must do equity' applies to one who seeks to avoid payment of money for the extinguishment of a lien and taxes as well as improvements enhancing the value of his estate, and at the same time desires the cancellation of a deed and removal of cloud from his title."

If the trial court and our court are correct in our interpretation of Paragraph 2 of the lease, this court is of the firm belief that the trial court equitably and properly disposed of the cross-action of defendant. However, we would want it specifically understood that we are limiting the offset recovery to the particular facts of this case and are not binding this court to a proposition that under a different set of facts and jury findings the producer could recover for such improvements.

Accordingly, the judgment of the trial court is in all things affirmed.